## HIGGINS v. HELMBOLD.

INSURANCE POLICY; ASSIGNMENT; BURDEN OF PROOF; PREPONDERANCE OF EVIDENCE.

In a suit to reinstate a life insurance policy which had been surrendered for its cash value by an assignee, to whom it was assigned absolutely, without any limitation, by the insured, who was a business man of large experience, his testimony that the policy was assigned only as security for a loan that was afterwards repaid, notwithstanding which the assignee refused to return it, is insufficient to sustain the assignor's burden of proof, where the assignee testifies that the policy was assigned as security for the purchase price of a business sold to the assignor, to be paid in monthly instalments, which he paid for a time, but afterwards failed to pay and also refused to continue payment of the premiums on the policy, while on this point the assignor, although testifying that he did not purchase the busi-

ness or agree to pay anything for it but made such monthly payments as were made merely as gratuities, is shown to have written a letter to the assignee six years after the payments commenced, saying that "the checks will be mailed you monthly as has been the custom. This is your own, the fulfilment of an obligation to you, and is not a gratuity from me."

No. 3136.   Submitted April 4, 1918.   Decided May 6, 1918.

HEARING on an appeal by the plaintiff from a decree of the Supreme Court of the District of Columbia in a suit to determine the title to an insurance policy.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is a suit in equity to determine the title to an insurance policy for $10,000 on the life of the appellant, Charles C. Higgins.   He claimed that in April, 1903, he assigned the policy to the appellee, Cora V. Helmbold, as security for the payment of moneys borrowed by him from her; that he repaid the money; and that, notwithstanding this, she refused to return the policy, but instead surrendered it to the insurance company for its cash value, received the money thereon, and placed it in a local bank.   He made the bank, and the insurance company which had issued the policy, as well as Mrs. Helmbold, parties to the suit, and asked for a decree to the effect that the money did not belong to the appellee; that it should be disposed of as the court might think proper; that the policy was improperly surrendered; and that it be reinstated.

Mrs. Helmbold, on the other hand, alleged that Higgins had purchased from her a brokerage business in 1903, agreed to pay her therefor $250 a month; gave her the policy in question as security for the carrying out of his undertaking; agreed that at his death she was to have the proceeds of the policy in lieu of the payments; that he turned the business over to another firm and "put his son in as a silent partner;" that in 1909, six years after he commenced making the payments, he stopped them and made no more; that in 1915 he refused to continue to pay the premiums upon the policy; and

that, in consequence of this, she was compelled for her protection to cash the policy. She also pleaded a counterclaim and asked that plaintiff's bill be dismissed and judgment entered in her favor for such sum as might be found due from him to her on account of his failure to make the payments. There was a decree in her favor.

*Mr. J. H. Ralston* and *Mr. W. E. Richardson* for the appellant.

*Mr. Justin Morrill Chamberlain* for the appellee.

Mr. Chief Justice SMYTH delivered the opinion of the Court:

A question of fact only is presented. The burden was on Higgins. There are inconsistencies and improbabilities in his case. Shortly before instituting this suit, he wrote to the insurance agent through whose office the policy had been issued, that he had assigned it to Mrs. Helmbold for the purpose of securing the repayment of $10,000 loaned by her to him, and repeated the statement in his first bill of complaint. The record clearly shows she did not have $10,000 to loan at that time. Some seventeen months after her answer had come in, Higgins by leave of court filed an amended bill in which he said that he had assigned the policy to her for her protection, but did not reveal in just what way it would operate to that effect. He further said that, after she received money from an insurance policy on the life of her husband, she loaned him various sums from time to time, and that in October, 1903, there was an arrangement made between him and her by which the policy (which, as we have seen, he had assigned to her in the April preceding) should be continued as security for the moneys loaned. He says that he did not purchase her brokerage business or agree to pay her anything for it, because it was practically valueless, and that the payment of $250 a month was in the nature of a gratuity. But, six years after he had commenced making the payments, he wrote to her— they having had a dispute about some business matters—as

follows: "Your brokerage checks will be mailed you monthly as has been the custom. This is your own, the fulfilment of an obligation to you, and is not a gratuity from me. Please do not think so. It belongs to you as the result of Charlie's [your husband's] business and is yours." Mrs. Helmbold's husband had been sick for quite a period before his death, during which time she conducted his business and after her husband's death she continued it for some months. The cashier of the bank where she kept her account testified that he "rather marveled at Mrs. Helmbold's success at the business." She said that the average net receipts were "never less than $400 a month, and as high as $800 and sometimes more;" and that she did not want to give up the business, but desired to keep it for her children. Nevertheless, Higgins, an old friend of the Helmbold family, persuaded her to do so, saying that in view of certain business conditions, which he mentioned, it would be wiser for her to accept $250 a month as a certainty than to continue the business. She yielded to his advice, according to her story, and transferred to him the business upon the conditions named, and he turned it over, as we have seen, to another firm and put in his son as a silent partner.

We think that, according to the preponderance of the evidence, Mrs. Helmbold's theory is correct. The record establishes that at the time the business was transferred to Higgins it was prosperous and easily worth what Mrs. Helmbold says he agreed to pay for it. Unless the policy of insurance was given to secure the amount of the purchase price, there was no reason for giving it. It could not serve her in any other way at that time. The assignment was general,—no limitation. Higgins was a business man of large experience. It is not likely that he would have assigned a policy absolutely if it was intended only as security for money borrowed. His statement made, as we have seen, six years after the assignment, that her brokerage checks would be mailed monthly as usual in fulfilment of an *obligation,* and *not* as a gratuity from him; and that they belonged to her and were hers as a result of her husband's business,—is strongly corroborative of Mrs. Helmbold's contention. Higgins ceased to send the checks and refused to

continue payment of premiums on the policy. In such a plight it was Mrs. Helmbold's right to take such course as she deemed best to serve the purpose for which the policy was assigned to her. Accordingly she cashed it and in doing so she was acting strictly within her rights under the agreement which she had with Higgins. We have carefully examined the decision in *Lorillard* v. *Clyde,* 142 N. Y. 456, 24 L.R.A. 113, 37 N. E. 489, the only case cited by the appellant, and find nothing in it which bears on this case.

The decree of the lower court is right, and it is affirmed at the cost of the appellant.    *Affirmed.*